UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ASLEY FERNANDES,<br><br>               Plaintiff,<br><br>  -against-<br><br>JMP GROUP LLC, JOSEPH A. JOLSON, CRAIG R. JOHNSON, MARK L. LEHMANN, KENNETH M. KARMIN, H. MARK LUNENBURG, CARTER D. MACK, JONATHAN M. ORSZAG, STACI SLAUGHTER, and GLENN H. TONGUE,<br><br>               Defendants. | Case No.: 21-cv-2640<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Asley Fernandes ("Plaintiff"), by the undersigned attorneys, for this complaint against Defendants, alleges upon personal knowledge with respect to Plaintiff, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This is an action brought by Plaintiff against JMP Group LLC ("JMP" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with JMP, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed merger (the "Proposed Transaction") of JMP by and among affiliates of Citizens Financial Group, Inc. ("Citizens Financial Group") and Jolt Acquisition LLC ("Merger Sub," and

1

collectively with Citizens Financial Group, "Citizens").

2. On or about September 8, 2021, JMP and Citizens announced an agreement and plan of merger, pursuant to which JMP would merge with and into affiliates of Citizens (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, JMP's shareholders would be entitled to receive $7.50 per share in cash for each share of JMP common stock they owned (the "Merger Consideration").

3. On or about October 15, 2021, in order to convince JMP's public common stockholders to vote in favor of the merger, the Defendants authorized the filing of a materially incomplete and misleading Schedule 14(a) Definitive Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC").

4. In particular, the Proxy contains materially incomplete and misleading information concerning the background of the Proposed Transaction and the valuation analyses performed by JMP's financial advisors, Keefe, Bruyette & Woods, Inc. ("KBW" or the "Financial Advisors") regarding the Proposed Transaction.

5. The Proposed Transaction is expected to close during the fourth quarter of 2021 and the special meeting of the Company's shareholders to vote on the Proposed Transaction will be scheduled in the coming weeks. Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the special meeting, so Plaintiff can properly exercise all corporate voting rights.

6. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to JMP's public

common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.  This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8.  Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9.  Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.

## PARTIES

10. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of JMP common stock.

11. Defendant JMP is a Delaware corporation with its principal executive offices located at 600 Montgomery Street, Suite 1100, San Francisco, California 94111. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "JMP."

12. JMP maintains an office in Texas at 83801 N. Capital of Texas Hwy., Suite E205, Austin, TX 78746.

13. Defendant Joseph A. Jolson ("Jolson") is, and has been at all relevant times, the Company's Chief Executive Officer, the beneficial owner of more than 30% of the Company's common stock, and the Chairman of the Board of Directors of the Company.

14. Defendant Craig R. Johnson ("Johnson") is, and has been at all relevant times, the Vice Chairman of the Board of Directors of the Company.

15. Defendant Mark L. Lehmann ("Lehmann") is, and has been at all relevant times, the President of the Company and a member of the Board of Directors of the Company.

16. Defendant Kenneth M. Karmin ("Karmin") is, and has been at all relevant times, a director of the Company.

17. Defendant H Mark Lunenburg ("Lunenburg") is, and has been at all relevant times, a director of the Company.

18. Defendant Carter D. Mack ("Mack") is, and has been at all relevant times, a director of the Company.

19. Defendant Jonathan M. Orszag ("Orszag") is, and has been at all relevant times, a director of the Company.

20. Defendant Staci Slaughter ("Slaughter") is, and has been at all relevant times, a director of the Company.

21. Defendant Glenn H. Tongue ("Tongue") is, and has been at all relevant times, a

director of the Company.

22. The Defendants identified in paragraphs 13 through 21 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

23. JMP is a publicly traded Delaware corporation and diversified capital markets firm that provides investment banking, sales and trading, and equity research services to corporate and institutional clients as well as alternative asset management products and services to institutional investors and high net-worth individuals. JMP also invests in corporate credit instruments through collateralized loan obligations and direct investments, and serves as an investment advisor. JMP's common stock trades on the NYSE under the ticker symbol "JMP."

24. Prior to the announcement of the Proposed Transaction, JMP had excellent growth prospects. Indeed, on July 29, 2021, less than two months before the Proposed Transaction was announced, JMP issued a press release entitled *JMP Group Reports Second Quarter 2021 Financial Results* announcing "the second-best quarter in our company's history" and stating in part:

> "JMP Group's operating earnings of $0.29 per share for the June quarter mark the second-best quarter in our company's history, driven by strong advisory revenues at JMP Securities, record results in our asset management business, and investment income that well exceeded our corporate costs," said Joe Jolson, chairman and CEO of JMP Group. "On a trailing-four-quarters basis, our operating earnings were a record $1.00 per share, representing a 32.9% return on average equity.
>
> "During the quarter, we successfully monetized certain principal investments, enabling us to call $25.0 million of our fixed-rate debt and reducing our long-term borrowings to less than $50.0 million as of July."

5

> "For the six months ended in June, JMP Securities' investment banking revenues were up 80% year over year," said Mark Lehmann, president of JMP Group and CEO of JMP Securities. "Through June of this year, we underwrote 19 IPOs, compared to 20 last year on the whole, and bookran nine transactions, versus nine throughout 2020.
>
> "In our advisory business, we reached the $50 million mark for total fee revenues over the latest 12 months and are thrilled that our investment in people continues to pay off. We built on our momentum in July and feel confident about the third quarter, given a strong backlog and active dialogs with an ever-growing number of corporate clients."

25. Thus, the Proposed Transaction comes at a time when JMP's future success was not fully reflected by its share price. As a result, the Proposed Transaction will "compensate" the Company's stockholders with cash that fails to adequately compensate them for the intrinsic value of their shares.

26. Despite JMP's intrinsic value and growth prospects, the Individual Defendants are agreeing to a merger that cashes out the Company's stockholders and deprives them the ability to partake in the Company's growth. The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Merger Consideration and allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiff and the Class to receive an inadequate Merger Consideration.

**The Proposed Transaction**

27. On September 8, 2021, JMP and Citizens issued a press release announcing the Merger Agreement, stating in part:

**CITIZENS FINANCIAL GROUP, INC. TO ACQUIRE JMP GROUP LLC**

*Expands capital markets capabilities for commercial clients*

*Deepens expertise in healthcare, technology, financial services and real estate sectors*

6

September 8, 2021 06:30 AM Eastern Daylight Time

PROVIDENCE, R.I. and SAN FRANCISCO—(BUSINESS WIRE)—Citizens Financial Group, Inc. (NYSE: CFG or "Citizens") and JMP Group LLC (NYSE: JMP or "JMP") announced today that they have entered into a definitive merger agreement under which Citizens will acquire JMP in an all-cash transaction.

JMP is a highly regarded capital markets firm that provides investment banking services, including strategic advisory, equity research and sales and trading focused primarily on the healthcare, technology, financial services and real estate sectors. Upon the closing of the transaction, JMP, which was founded in 1999 and is headquartered in San Francisco, will operate as a wholly-owned subsidiary of Citizens.

"The acquisition of JMP represents an attractive opportunity for us to continue to broaden both our capabilities and our customer base in our commercial banking segment," said Bruce Van Saun, chairman and chief executive officer at Citizens. "The acquisition further strengthens Citizens' growing corporate finance and strategic advisory capabilities, with a focus on high growth and compelling industry sectors."

"We are adding a wealth of talented bankers as well as an institutional equities franchise that aligns well with our sector-focused corporate banking philosophy," added Donald McCree, vice chairman and head of commercial banking at Citizens. "The transaction brings us a strong platform based in San Francisco and New York, expanding both our range of services and our national presence."

"Citizens takes an approach to business and client service that mirrors our own," said Joseph Jolson, founder and chairman of JMP. "We are energized by the opportunity to provide new strategic advisory and equities capabilities to Citizens' corporate client base while simultaneously offering JMP Securities' clients a highly complementary set of products and services as part of a leading U.S. depository institution."

Under the terms of the merger agreement, JMP shareholders will receive $7.50 for each common share of JMP they own, or approximately $149 million in cash.

The merger agreement has been unanimously approved by the boards of directors of each company, and the transaction is targeted to close in the fourth quarter of 2021, subject to approval by the shareholders of JMP, receipt of required regulatory approvals, and satisfaction of other customary closing conditions. As of September 1, 2021, executive management and members of JMP's board of directors owned approximately 60% of its outstanding common shares.

Sullivan & Cromwell, LLP served as legal advisor to Citizens in connection with the transaction. Keefe, Bruyette & Woods, *A Stifel Company*, and JMP Securities LLC served as financial advisors to JMP, and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. served as legal advisor.

**The Preclusive Deal Protection Devices**

28. To the detriment of the Company's shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

29. The Merger Agreement is protected by "no-shop" provisions that prohibit, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations.

30. These Merger Agreement also contains "information rights" provisions, which require the Board to provide Citizens with written notice of any Acquisition Proposal and further require the Board to provide prior written notice of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with Citizens following receipt of the notice, so that Citizens has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a Superior Proposal.

31. In addition, the Merger Agreement provides that the Company will be required to pay a termination fee of 4% of the aggregate merger consideration with respect to any termination under the no-shop provision.

32. Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for the Company's shares in the Proposed Transaction and the flawed and conflicted negotiations process, supports an inference that the Board was not acting in good faith in approving

the terms of the Merger Agreement.

33. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**The Proxy Omits Material Information**

34. On or about October 15, 2021, in order to convince the Company's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of the materially incomplete and misleading Proxy with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

35. Specifically, the Proxy omits two types of material information: (i) information regarding the background of the Proposed Transaction; and (ii) financial information that renders the Financial Advisors' fairness analysis materially false, misleading, or incomplete.

**A.   The Proxy Omits Material Information Regarding the Background of the Proposed Transaction**

36. The Proxy fails to provide material information regarding the background of the merger that implicates the possibility that the Merger Consideration is inadequate.

37. The Proxy fails to disclose (i) whether the Board considered forming a Special Transaction Committee prior to May 27, 2021, (ii) why the Board authorized members of JMP management to steer negotiations for several months before forming the Special Transaction Committee, including who from JMP conducted an "in-person management meeting and dinner" with Company B on May 10, 2021, and (iii) whether the Special Transaction Committee considered engaging its own *independent* financial advisor, rather than KBW, a financial advisor that had not only previously been engaged by JMP management but also performed advisory services in connection with the merger of JMP affiliate Harvest Capital Credit Corporation

("HCC"), which was still in the process of closing on June 1, 2021 when KBW first "reported to and became subject to the sole direction of the Special Transaction Committee as the Special Transaction Committee's financial advisor."

38. The Proxy fails to disclose material information regarding the prior merger of JMP affiliate Harvest Capital Credit Corporation ("HCC"), including (i) the amount of compensation that the Financial Advisors received from HCC during the two-year period leading up to the Proposed Transaction, (ii) the fact that Defendant Jolson was the Chief Executive Officer and controlling shareholder of HCC, and began negotiating the sale of JMP almost immediately after HCC executed its merger agreement, (iii) the extent to which JMP management and KBW also discussed the HCC merger during the period leading up to the HCC merger shareholder vote on June 7, 2021, and (iv) the extent to which JMP management and KBW discussed the possibility of a JMP merger during the period leading up to the execution of the HCC merger agreement.

39. The Proxy fails to disclose (i) the fact that, on April 22, 2021, in the midst of the negotiation of the Proposed Transaction, former JMP director David DiPietro chose not to run for re-election on April 22, 2021, and (ii) the extent, if any, to which former director DiPietro had expressed a belief that a Special Transaction Committee should be coordinating merger talks rather than JMP management.

### B. The Proxy Omits Material Financial Information that Renders the Company's Financial Advisors' Fairness Analysis Materially Misleading

40. The Proxy also omits material information that renders the Financial Advisors' Fairness Analysis materially misleading.

41. The Proxy describes the Fairness Opinion and the various valuation analyses that the Financial Advisors performed to render its opinion but fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the

underlying assumptions that underpin the fairness opinion. Specifically, the Proxy does not disclose enough information regarding the financial projections, inputs, and assumptions for various financial valuations. Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Merger Consideration is fair, or accurately assess the reliability of the Fairness Opinion. The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them. Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

42. With respect to the Management Projections, the Proxy fails to disclose certain line-items, including (i) the Company's projected Tax-rate during the period covered by the Management Projections. By providing the limited summary in the Proxy and withholding the omitted information, Defendants render the Management Projections in the Proxy materially incomplete and provide a misleading valuation picture of the Company. With respect to financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

43. With respect to KBW's *Selected Companies Analysis* beginning on Page 25, the Proxy fails to disclose: (i) the underlying metrics and individual multiples for each of the selected companies, and (ii) the full rationale and basis for applying KBW's selected reference multiples. Indeed, it appears that at least some of the selected companies may be fundamentally different from JMP, which has Revenue multiples at the low end of the range but Earnings multiples at the high end of the range, which suggests that the selected companies' higher revenue multiples may simply be an artifact of selecting companies that are much smaller than JMP.

44.     With respect to KBW's *Selected Transactions Analysis* beginning on Page 26, the Proxy fails to disclose: (i) whether each transaction involved cash consideration, stock consideration, or a cash-stock mix, (ii) the underlying metrics and individual multiples for each of the selected companies, and (iii) the full rationale and basis for applying KBW's selected reference multiples.  Indeed, simply including much smaller or larger transactions can greatly affect the multiples implied in a given transaction, and the analysis suggests that the Merger Consideration of just $7.50 per share (or possibly $7.73 per share if the conditions for the special dividend become satisfied) may markedly undervalue JMP:

|  | Implied Value Per Share Range of JMP Common Stock |
|---|---|
| Based on LTM Revenue for the period ended June 30, 2021 | $3.85 to $9.94 |
| Based on CY 2021 Estimated Operating Net Income | $6.89 to $14.25 |
| Based on June 30, 2021 GAAP Book Value | $4.44 to $9.95 |
| Based on June 30, 2021 Adjusted Reported Non-GAAP Book Value | $5.54 to $12.43 |
| Based on June 30, 2021 Pro Forma Book Value (adjusted for Workspace) | $6.80 to $15.26 |

45.     With respect to KBW's *Discounted Cash Flow Analysis* beginning on Page 27, the Proxy fails to: (i) fully disclose the rationale and basis for selecting a discount rate range of 11.0% to 15.0%, (ii) fully disclose the terminal values and rationale and basis for applying a range of terminal Operating Income multiples of 6.9x to 9.3x (especially given that JMP's current forward multiple is 10.4x), and (iii) provide a sensitivity table that presents the derived enterprise values across the full range of discount rates and exit multiples.

46.     This information is material to the Company's shareholders, and the omission of this information renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading.  As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount

rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars*…. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added). Without the above-mentioned information, the Company's shareholders cannot: (i) evaluate for themselves the reliability of the *Discounted Cash Flow Analysis*, (ii) make a meaningful determination of whether the implied equity value ranges properly value the Company or were the result of an unreasonable judgment by the Financial Advisors, or (iii) make an informed decision regarding whether to vote in favor of the Proposed Transaction.

47. The Proxy states that an "investment banking affiliate of KBW currently maintains a business relationship with an affiliate of CFG to jointly market certain services to real estate investment trusts and pays such CFG affiliate a portion of the compensation received by such KBW affiliate for its services to such real estate investment trusts" but (i) does not otherwise describe the extent of this relationship or quantify the amount of these payments, and (ii) fails to disclose when KBW actually disclosed this conflict of interest to the Board and/or to the Special Transaction Committee before the Special Transaction Committee effectively adopted the Board's pre-existing retention of KBW as financial advisor.

48. Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards

were exposed—the others were concealed. If a Proxy discloses financial projections and valuation information, such projections and valuations must be complete, accurate, and honest. The question is not simply whether there is a duty to speak, but also whether there may be liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases). Accordingly, Defendants have disclosed some of the information related to the projections, assumptions, and inputs relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information. Thus, Defendants' omission renders the projections and summaries disclosed in the Proxy misleadingly incomplete.

49. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

50. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

51. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use

of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

52. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

53. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

54. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the valuation analyses performed by the Company's Financial Advisors in support of its fairness opinion.

55. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were

15

misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

56. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Company's Financial Advisors reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

57. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The

Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

58. The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

59. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

60. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

61. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and

misleading.

62. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

64. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

65. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

66. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

67. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 25, 2021

**ADEMI LLP**

By: */s/ John D. Blythin*
John D. Blythin (Wis. SBN 1046105)
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: 414-482-8000
Fax: 414-482-8001
Email: jblythin@ademilaw.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**ADEMI LLP**
Guri Ademi
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com


*Attorneys for Plaintiff*